**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ALASKA**

STEPHEN MATAKATLA JOHNSAMSON,

                           Plaintiff,

     vs.

ANDREW SAUL,[1]
Commissioner of Social Security,

                           Defendant.

Case No. 3:18-cv-00198-SLG

## DECISION AND ORDER

On or about May 31, 2016, Stephen Matakatla Johnsamson filed an application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act ("the Act"),[2] alleging disability beginning September 1, 2015.[3]  Mr. Johnsamson has exhausted his administrative remedies and filed a Complaint seeking relief from this Court.[4]

Mr. Johnsamson's opening brief asks the Court to reverse and remand the agency decision.[5]  The Commissioner filed an Answer and a brief in opposition to Mr.

---

[1] Andrew Saul is now the Commissioner of Social Security and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d).  *See also* section 205(g) of the Social Security Act, 42 U.S.C. 405(g) (action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

[2] The Court uses the terms "disability benefits" and "DIB" throughout the Decision and Order.

[3] Administrative Record ("A.R.") 262–63.  The ALJ decision cites April 28, 2016 as the application date for Mr. Johnsamson's DIB claim.  A.R. 38.

[4] Docket 1 (Johnsamson's Compl.).

[5] Docket 14 (Johnsamson's Br.).

Johnsamson's opening brief.[6]  Mr. Johnsamson filed a reply brief on March 24, 2019.[7]

Oral argument was not requested and was not necessary to the Court's decision.  This

Court has jurisdiction to hear an appeal from a final decision of the Commissioner of

Social Security.[8]  For the reasons set forth below, Mr. Johnsamson's request for relief will

be granted.

## I.    STANDARD OF REVIEW

A decision by the Commissioner to deny disability benefits will not be overturned

unless it is either not supported by substantial evidence or is based upon legal error.[9]

"Substantial evidence" has been defined by the United States Supreme Court as "such

relevant evidence as a reasonable mind might accept as adequate to support a

conclusion."[10]  Such evidence must be "more than a mere scintilla," but may be "less than

a preponderance."[11]  In reviewing the agency's determination, the Court considers the

evidence in its entirety, weighing both the evidence that supports and that detracts from

---

[6] Docket 12 (Answer); Docket 15 (Defendant's Br.).

[7] Docket 16 (Reply).

[8] 42 U.S.C. § 405(g).

[9] *Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (citing *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990)).

[10] *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

[11] *Perales*, 402 U.S. at 401; *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975) (per curiam).

the administrative law judge ("ALJ")'s conclusion.[12] If the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld.[13] A reviewing court may only consider the reasons provided by the ALJ in the disability determination and "may not affirm the ALJ on a ground upon which [he] did not rely."[14] An ALJ's decision will not be reversed if it is based on "harmless error," meaning that the error "is inconsequential to the ultimate nondisability determination . . . or that, despite the legal error, the agency's path may reasonably be discerned, even if the agency explains its decision with less than ideal clarity."[15] Finally, the ALJ has a "special duty to fully and fairly develop the record and to assure that the claimant's interests are considered."[16] In particular, the Ninth Circuit has found that the ALJ's duty to develop the record increases when the claimant is unrepresented or is mentally ill and thus unable to protect his own interests.[17]

//

//

---

[12] *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

[13] *Gallant v. Heckler*, 753 F.2d 1450, 1453 (9th Cir. 1984) (citing *Rhinehart v. Finch*, 438 F.2d 920, 921 (9th Cir. 1971)).

[14] *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014).

[15] *Brown-Hunter v. Colvin,* 806 F.3d 487, 492 (9th Cir. 2015) (internal quotation marks and citations omitted).

[16] *Smolen v. Chater,* 80 F.3d 1273,1288 (9th Cir. 1996) (quoting *Brown v. Heckler,* 713 F.2d 441, 443 (9th Cir. 1983)); *see also Garcia v. Comm'r of Soc. Sec.,* 768 F.3d 925, 930 (9th Cir. 2014).

[17] *Tonapetyan v. Halter,* 242 F.3d 1144, 1150 (9th Cir. 2001).

## II.    DETERMINING DISABILITY

The Act provides for the payment of disability insurance to individuals who have contributed to the Social Security program and who suffer from a physical or mental disability.[18]  In addition, SSI may be available to individuals who are age 65 or older, blind, or disabled, but who do not have insured status under the Act.[19]  Disability is defined in the Act as follows:

> [I]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.[20]

The Act further provides:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.[21]

---

[18] 42 U.S.C. § 423(a).

[19] 42 U.S.C. § 1381a.

[20] 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

[21] 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining disability within the meaning of the Act.[22] A claimant bears the burden of proof at steps one through four in order to make a prima facie showing of disability.[23] If a claimant establishes a prima facie case, the burden of proof then shifts to the agency at step five.[24] The Commissioner can meet this burden in two ways: "(a) by the testimony of a vocational expert, *or* (b) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2."[25] The steps, and the ALJ's findings in this case, are as follows:

**Step 1.** Determine whether the claimant is involved in "substantial gainful activity." *The ALJ concluded that Mr. Johnsamson engaged in substantial gainful activity after the alleged onset date of September 1, 2015 through November 2015. The ALJ noted that the remaining findings in the decision addressed the period during which Mr. Johnsamson did not engage in substantial activity.*[26]

**Step 2.** Determine whether the claimant has a medically severe impairment or combination of impairments. A severe impairment significantly limits a claimant's physical or mental ability to do basic work activities and does not consider age, education, or work experience. The severe impairment or combination of impairments must satisfy the

---

[22] 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[23] *Treichler v. Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1096 n.1 (9th Cir. 2014) (quoting *Hoopai v. Astrue*, 499 F.3d 1071, 1074–75 (9th Cir. 2007)); s*ee also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

[24] *Treichler*, 775 F.3d at 1096 n.1; *Tackett*, 180 F.3d at 1098 (emphasis in original).

[25] *Tackett*, 180 F.3d at 1101.

[26] A.R. 40.

twelve-month duration requirement. *The ALJ determined that Mr. Johnsamson had the following severe impairments: diabetes mellitus; hypertension; hyperlipidemia; sleep apnea; degenerative disc disease and degenerative joint disease of the cervical and lumbar spine; osteoarthritis of the bilateral shoulders; and plantar fasciitis.*[27]

**Step 3.** Determine whether the impairment or combination of impairments meets or equals the severity of any of the listed impairments found in 20 C.F.R. pt. 404, subpt. P, app.1 so as to preclude substantial gainful activity. If the impairment(s) is(are) the equivalent of any of the listed impairments, and meet(s) the duration requirement, the claimant is conclusively presumed to be disabled. If not, the evaluation goes on to the fourth step. *The ALJ determined that Mr. Johnsamson did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment.*[28]

Before proceeding to step four, a claimant's residual functional capacity ("RFC") is assessed. Once determined, the RFC is used at both step four and step five. An RFC assessment is a determination of what a claimant is able to do on a sustained basis despite the limitations from his impairments, including impairments that are not severe.[29] *The ALJ concluded that Mr. Johnsamson had the RFC to perform medium work except*

---

[27] A.R. 40.

[28] A.R. 41.

[29] 20 C.F.R. § 404.1520(a)(4).

*that he was additionally limited to "only frequent kneeling and climbing [of] ladders, ropes or scaffolds."[30]*

**Step 4.** Determine whether the claimant is capable of performing past relevant work. At this point, the analysis considers whether past relevant work requires the performance of work-related activities that are precluded by the claimant's RFC. If the claimant can still do his past relevant work, the claimant is deemed not to be disabled. Otherwise, the evaluation process moves to the fifth and final step. *The ALJ found that Mr. Johnsamson was capable of performing past relevant work as a schedule clerk, porter, and medical records clerk.[31]*

**Step 5.** Determine whether the claimant is able to perform other work in the national economy in view of his age, education, and work experience, and in light of his RFC. If so, the claimant is not disabled. If not, the claimant is considered disabled. *The ALJ determined that Mr. Johnsamson was capable of past relevant work and did not reach step five in his analysis.[32]*

The ALJ concluded that Mr. Johnsamson was not disabled at any time from September 1, 2015 through August 21, 2017, the date of the decision.[33]

---

[30] A.R. 42.

[31] A.R. 45.

[32] A.R. 45.

[33] A.R. 45–46.

### III. PROCEDURAL AND FACTUAL BACKGROUND

Mr. Johnsamson was born in 1963; he is 56 years old.[34]  He reported last working as a traffic management specialist for the Department of Defense from June 2014 to October 2015.  Mr. Johnsamson also reported working in the past as a transportation assistant for the Department of Defense, as a patient services assistant for the Alaska VA Healthcare System, as a passenger and baggage processor for the U.S. Air Force, and as an active duty service member of the U.S. Air Force.[35]

On January 30, 2017, the Social Security Administration ("SSA") determined that Mr. Johnsamson was not disabled under the applicable rules.[36]  On March 30, 2017, Mr. Johnsamson requested a hearing before an ALJ.[37]  On August 1, 2017, Mr. Johnsamson appeared and testified without a representative at a hearing held before ALJ Paul Hebda.[38]  On August 21, 2017, the ALJ issued an unfavorable ruling from September 1, 2015 through the date of his decision.[39]  On December 7, 2017, the Appeals Council denied Mr. Johnsamson's request for review.[40]  On October 24, 2018, the Appeals Council

---

[34] A.R. 262.

[35] A.R. 342–56.  At the August 1, 2017 hearing, Mr. Johnsamson testified that he stopped working on November 4, 2015.  A.R. 59–60.

[36] A.R. 38, 119.

[37] A.R. 38, 126.

[38] A.R. 59–62, 83–96.

[39] A.R. 35–46.

[40] A.R. 4–9.

granted Mr. Johnsamson's request for an extension of time to commence a civil action.[41]

Mr. Johnsamson appealed to this Court on September 5, 2018.[42]

*Medical Records*

Although Mr. Johnsamson's medical records date back to 1992, the Court focuses on the relevant medical records after the alleged onset date of September 1, 2015.[43] However, the following are the most relevant records before September 1, 2015:

On June 7, 2007, Mr. Johnsamson visited Lori Kelsey, M.D., for a compensation and pension examination. Dr. Kelsey assessed Mr. Johnsamson with the following: (1) right elbow calcific tendonitis distal triceps tendon; (2) right shoulder rotator cuff tendonitis with prior cuff tear; (3) middle back degenerative disease; (4) hypertension with trace proteinuria; (5) bilateral carpal tunnel syndrome; (6) bilateral plantar fasciitis and achilles tendonitis; (7) insomnia; (8) allergic rhinitis and deviated septum status post septorhinoplasty; (9) vitiligo affecting 3% of the total body and exposed surface area; (10) gastroesophageal reflux disease; (11) bilateral knee strain; (12) anal fissures; (13) enthesopathy tendonitis; and (14) hyperlipidemia.[44]

On September 24, 2007, the Department of Veterans Affairs issued a disability rating decision. It determined that Mr. Johnsamson had a service connection for insomnia

---

[41] A.R. 1.

[42] Docket 1.

[43] There are multiple duplicate treatment notes in the Court's record. To the extent possible, the Court cites the first treatment note to appear in the medical record.

[44] A.R. 582–88.

with an evaluation of 30 percent; for anal fissure with 20 percent; bilateral plantar fasciitis with 10 percent; bilateral knee strain with 10 percent; hypertension with 10 percent; gastroesophageal reflux disease with 10 percent; and facial and extremity vitiligo with 10 percent. His entitlement to individual unemployability was deferred pending receipt of Mr. Johnsamson's application, but the rating decision noted that Mr. Johnsamson met the criteria for individual unemployability.[45]

On January 23, 2008, the Department of Veterans Affairs granted a service connection for tinnitus with an evaluation of 10 percent.[46]

On March 13, 2009, Mr. Johnsamson went to the emergency department at Alaska Regional Hospital. He reported lower back pain after a motor vehicle accident. X-rays showed no acute injury to the cervical, thoracic, or lumbar spine. He was assessed with cervical lumbar strain.[47]

On May 6, 2009, Mr. Johnsamson had an MRI of the lumbar spine. The MRI showed "[s]ignificant L5-S1 paracentral/left foraminal disc bulge, which results in left lateral recess stenosis and moderate to severe left neural foraminal narrowing"; a "[s]mall L4-5 right far lateral and right foraminal disc bulge, which results in mild right neural foraminal narrowing"; and an anterior annular tear at L3-4. Additionally, Mr. Johnsamson had an MRI of the thoracic spine and cervical spine. The MRI of the thoracic spine

---

[45] A.R. 194–209.

[46] A.R. 213–17.

[47] A.R. 400–01, 653–55.

showed "[d]egenerative spondylosis of the thoracic spine without posterior disc bulges, central canal stenosis, nor neural foraminal narrowing." The MRI of the cervical spine showed "[m]ultilevel spondylosis, worst at the C6-7 level"; "C6-7 significant right paracentral and right foraminal disc bulge is noted, which offaces the right side of the anterior thecal sac and impresses on the cord, and results in severe right neural foraminal narrowing"' and "C5-6 central disc bulge with annular tear which, in combination with bilateral uncovertebral facet arthropathy, results in mild to moderate right neural foraminal narrowing."[48]

On June 30, 2010, Mr. Johnsamson visited Larry Kropp, M.D., an interventional anesthesiologist in Anchorage, Alaska. He reported a 10-year history of lower back pain that had recently worsened. Dr. Kropp noted the recent MRI showed "a large protrusion at L5/S1 with foraminal stenosis mainly on the left" with minor protrusions and degenerative changes at other levels. On physical examination, Mr. Johnsamson had a positive straight leg raise test on the left with 5/5 strength in all extremities and no obvious deficits in sensation. He was assessed with lumbar displaced disc. Dr. Kropp recommended a steroid injection at L5 on the left and added that "if that fails he may need surgery."[49]

On July 16, 2010, Mr. Johnsamson had a steroid injection at L5 on the left.[50]

---

[48] A.R. 645–49.

[49] A.R. 405.

[50] A.R. 407.

On May 10, 2012, Mr. Johnsamson had x-rays taken of both knees and his lumbar spine. The x-ray of his left knee was normal. The x-ray of his right knee was also unremarkable. The x-ray of his lumbar spine showed "osteophytic changes," but "relatively good preservation of the intervertebral disc spaces."[51]

On August 27, 2012, the Department of Veterans Affairs rated Mr. Johnsamson's combined disability rating as 90%.[52]

On May 8, 2013, Mr. Johnsamson had x-rays taken of his left and right knees. Both x-rays showed "[n]o acute osseous abnormality or osteoarthritis."[53]

On October 3, 2013, Mr. Johnsamson had a steroid injection in his left knee.[54]

On October 11, 2013, Mr. Johnsamson had bilateral feet and knee x-rays taken. The x-rays of the feet showed bilateral calcifications, achilles enthesophytes, and minimal degenerative changes. The x-rays of the knees showed "[m]inimal degenerative changes to the tibiofemoral joints" and "[m]inimal to mild degenerative changes to the patellofemoral joints."[55]

---

[51] A.R. 656–57.

[52] A.R. 227–31.

[53] A.R. 631–32.

[54] A.R. 756.

[55] A.R. 760–62.

On December 9, 2013, Mr. Johnsamson had an MRI of the left knee. The MRI showed a small effusion with no fracture and a "[h]eterogeneously increased signal consistent with tear at the medial meniscal root."[56]

On December 20, 2014, Mr. Johnsamson had an MRI of the lumbar spine. The MRI showed:

> "[m]ild congenital central spinal stenosis. Multilevel degenerative disc disease with a small disc herniation at L2-L3, a right posterior lateral disc herniation at L3-L4 resulting in mild right neural foraminal narrowing. A right posterior lateral disc herniation at L4-L5 causing mild right neural foraminal with borderline impingement upon the exiting right L4 nerve root, and a broad-based left paracentral/posterior lateral disc herniation at L5-S1 resulting in compression of the low left S1 nerve root causes severe left and moderate central spinal stenosis. No evidence of cauda equina compression."[57]

On February 20, 2015, Mr. Johnsamson had an x-ray of his lumbosacral spine. The x-ray showed "[m]ild straightening of the normal lumbar lordosis" and "[m]ild multilevel degenerative disc disease with vertebral body spurring."[58] On the same date, Mr. Johnsamson had an MRI of the lumbar spine. The MRI showed right sided disc herniation at L4-L5 impinging on the right L4 nerve root and left sided disc herniation at L5-S1 compressing the S1 nerve root.[59]

---

[56] A.R. 764.

[57] A.R. 957.

[58] A.R. 640–41.

[59] A.R. 544–45.

On May 20, 2015, Mr. Johnsamson had a CT scan of his head. The CT showed no acute intracranial findings. On the same date, Mr. Johnsamson had an x-ray of his cervical spine. The x-ray showed "[d]egenerative cervical spondylosis."[60]

On May 28, 2015, Mr. Johnsamson visited Regina Krel, M.D., at the VA neurology outpatient clinic in Northport, New York. He reported headaches and neck pain. Mr. Johnsamson also reported that his neck pain and headaches interfered with his daily activities and that he had "taken multiple sick days due to his pain." He was assessed with cervicogenic headaches; hypertension, acceptably controlled; dyslipidemia; diabetes mellitus; GERD; obstructive sleep apnea; insomnia; and chronic back pain/neck pain.[61]

On June 15, 2015, Mr. Johnsamson had a CT scan of his cervical spine. The CT scan showed "[p]rominent anterior bulky osteophytes" from C4-7," but "[n]o other significant abnormalities" were seen.[62]

On June 25, 2015, Mr. Johnsamson had an CT scan of the lumbar spine. The CT scan showed multilevel degenerative changes "superimposed on congenitally narrowed central canal, worse at L2-3 and L5-S1"; atherosclerotic disease; and "[m]ultiple scattered shotty retroperitoneal lymph nodes." The radiologist noted that the findings of the MRI were not significantly changed since the December 20, 2014 evaluation, although the imaging techniques differed.[63]

---

[60] A.R. 638–39.

[61] A.R. 547–53, 569–72.

[62] A.R. 637–38.

[63] A.R. 618–19, 635–36.

On July 15, 2015, Mr. Johnsamson visited Marilyn Otero, P.A., at the Brooklyn HHS Veteran's Hospital. He reported chronic lower back pain "since the year 2000, worsening in recent years, with left lower extremity pain since 2008." He reported that his lower back pain was both left and right-sided with left mid-lateral thigh numbness and left lower extremity paresthesia. Mr. Johnsamson also reported that his mid-lower back pain was "worse on prolonged sitting or ambulation." On physical examination, Mr. Johnsamson's motor strength was 5/5 throughout, but with lower back pain on left lower extremity resistance. PA Otero observed negative Hoffman's and Clonus tests and Mr. Johnsamson's sensation to light touch was intact distally. PA Otero opined that decompression surgery "would most likely address his left lower extremity radicular symptoms; but not address his chronic complaints of back pain." She also opined that Mr. Johnsamson was "neurologically stable except for his subjective complaints of left lower extremity numbness." She recommended conservative therapies, including physical therapy; pool therapy; back school; HEP; acupuncture; and an interventional pain management consultation for an epidural steroid injection evaluation.[64]

On August 1, 2015, Mr. Johnsamson had bilateral x-rays taken of his knees. The x-rays showed "[b]ilateral patella alta and lateral patellar tilt" with "[m]arginal spurring at the lower pole of the patella on the right" with "[t]ibiofemoral joints appearing intact."[65] He

---

[64] A.R. 13–16, 554–55. On August 24, 2015, PA Otero added an addendum to her treatment notes of July 15, 2015, noting that Mr. Johnsamson had telephoned the clinic and she had had "a conversation regarding disability papers." A.R. 666. On September 2, 2015, a second addendum noted that Mr. Johnsamson's disability papers had been filled out. A.R. 667–70.

[65] A.R. 643–44.

also had bilateral x-rays taken of his wrists. The x-rays showed "[b]orderline widening of the scapholunate joint bilaterally" and "[m]ild spurring at the scapholunate joint on the right" with "[m]ild to moderate arthrosis at the basal joint bilaterally."[66] On the same date, Mr. Johnsamson saw Steven Olster, RPA-C, for an examination and consultation regarding his ankle, knee, lower leg, and wrist conditions. He reported that he was unable to tolerate stairs, walk more than five blocks, or drive without pain. Mr. Johnsamson reported that his knee condition limited his "standing, sitting at work." He also reported that his knee condition caused him to miss days at work, leave work early due to pain, and "stand up and move around after being seated too long." He also reported that he had to go home at least once per week and on occasion had to leave early or come in late due to his wrist condition. On physical examination, PA Olster noted that Mr. Johnsamson's right and left ankles and right and left wrists were outside the normal range of motion due to pain on examination, but the pain did not result in or cause functional loss. His range of motion of the knees bilaterally was also limited due to stated pain. Mr. Johnsamson had no knee joint instability on either side. His strength testing was normal at 5/5 bilaterally in his lower and upper extremities and he had no muscle atrophy or ankylosis. There were no signs or symptoms of carpal tunnel syndrome on examination of his wrists.[67]

---

[66] A.R. 542–43.

[67] A.R. 513–43.

On August 10, 2015, the Department of Veterans Affairs decided that Mr. Johnsamson had a service connection for chronic right and left wrist sprain and right and left knee patellofemoral pain syndrome at 10 percent disabling.[68]

On August 31, 2015, Mr. Johnsamson visited Heather Jones, M.D., at Capstone Family Medicine in Eagle River, Alaska. He reported neck pain and low back pain caused by standing or sitting for prolonged periods. Dr. Jones recommended that Mr. Johnsamson "pursue pain management for his neck as he is very young and should still be able to pursue a meanin[g]ful career and should be able to get his neck and back pain under control" and that he "may have to adjust [his] work station, get lumbar support or have pain management [prescription] medications for pain." Dr. Jones opined that Mr. Johnsamson's limitations on sitting and standing "should not preclude him from working." She also opined that he "is able to work but may need to pursue a different type job."[69]

The following are the more relevant records after the September 1, 2015 alleged onset date:

On September 2, 2015, Donato Pacione, M.D., a neurosurgeon at NYHH VAMC, completed a health provider form on Mr. Johnsamson's behalf. Dr. Pacione assessed Mr. Johnsamson with chronic disc herniation as of 2011, pursuant to Mr. Johnsamson's report. He recommended interventional pain management and physical therapy with operative intervention at a future date if conservative measures failed. Dr. Pacione

---

[68] A.R. 192–93, 221–26.

[69] A.R. 671–72.

opined that Mr. Johnsamson was unable to tolerate prolonged sitting or standing. On physical examination, Dr. Pacione observed that Mr. Johnsamson was "intact" neurologically.[70]

On September 12, 2015, Mr. Johnsamson had an MRI of his thoracic spine. The MRI showed "[m]ild degenerative changes in the thoracic spine" with "no significant disc herniation" and "[n]o canal or foraminal stenosis in the thoracic spine, with no cord compression."[71]

On November 5, 2015, Mr. Johnsamson initiated care with Myron Schweigert, D.C., at Chugach Chiropractic Clinic in Eagle River, Alaska. DC Schweigert observed no abnormal changes in Mr. Johnsamson's deep tendon reflexes in the upper extremities and "low normal" deep tendon reflexes in the patellar and achilles. DC Schweigert also observed a positive Kemp's Test and Bragard's sign bilaterally. He observed that Mr. Johnsamson's movement was painful.[72]

On December 15, 2015, Mr. Johnsamson initiated care with Diana Hess, N.P., at Cornerstone Medical Clinic in Anchorage, Alaska. He reported back pain, neck pain, knee pain, migraines, dry eyes, and skin tags on his inner thighs. He reported that chiropractic

---

[70] A.R. 291–95.

[71] A.R. 959.

[72] A.R. 808–12. Mr. Johnsamson attended chiropractic sessions on November 6, 2015, November 13, 2015, November 17, 2015, November 23, 2015, December 3, 2015, and December 10, 2015. A.R. 813–28.

treatments helped "a little," but he wanted to pursue other options. NP Hess assessed Mr. Johnsamson with HTN, GERD, DMII, hyperlipidemia, and migraines.[73]

On December 21, 2015, Mr. Johnsamson saw DC Schweigert for chiropractic treatment.[74]

On March 15, 2016, Mr. Johnsamson initiated care with James Glenn, PA-C, at the Veterans Hospital in Anchorage, Alaska. He reported cervical spine pain and lower back pain with numbness and "tingling down the 'whole' left leg." On physical examination PA Glenn observed no swallowing difficulty, no breathing difficulty, heel to toe walking without difficulty; weakness in muscle strength in the bilateral grip, hand intrinsics, and slightly with wrist extension, but 5/5 strength in the remaining upper extremities; and limited cervical spine range of motion due to pain. PA Glenn noted that Mr. Johnsamson experienced the same amount of pain with and without downward pressure on his neck. X-rays of the cervical spine taken at the visit showed "seven well-formed cervical vertebrae without profound significant disc degeneration," but "significant anterior osteophytes anterior to C4-C5, C6-C7." PA Glenn noted that the largest osteophyte was over C4-C5 with a "bone which does protrude about 8 to 9 mm anteriorly," but "[n]o instability on flexion and extension views and no acute osseous abnormalities." PA Glenn diagnosed Mr. Johnsamson with "[c]hronic cervical spine pain with referral symptoms into

---

[73] A.R. 780–82.

[74] A.R. 829. Mr. Johnsamson attended additional chiropractic sessions on December 23, 2015, December 28, 2015, and December 30, 2015, February 26, 2016, March 4, 2016, March 8, 2016, March 11, 2016, March 15, 2016, March 17, 2016, and March 21, 2016. A.R. 830–68.

the paraspinal musculature over occipital lob down into bilateral trapezius without frank radiculopathy"; "[w]eakness in bilateral uppers with hand intrinsics"; "[s]ignificant anterior osteophytes from C4-C7"; and lower back pain, "not fully evaluated today."[75]

On March 21, 2016, David Prentice, D.C., at Chugach Chiropractic Clinic, completed a health provider certification form for the U.S. Department of Labor. He opined that Mr. Johnsamson was unable to perform prolonged sitting or standing. DC Prentice recommended rehabilitation and chiropractic care.[76]

On March 24, 2016, Mr. Johnsamson saw Byron Perkins, D.O., at Cornerstone Medical Clinic. He reported lower back, neck, and bilateral knee pain. On physical examination, Dr. Perkins observed intact cranial nerves, a neurosensory exam within normal limits, good hip flexion and knee extension against resistance, preserved balance, equal and symmetric motor strength, full squat and return to standing without difficulty, and a normal straight leg test. Dr. Perkins performed osteopathic manipulation at the visit and noted that Mr. Johnsamson demonstrated improved range of motion and reported less pain following treatment.[77] On the same date, Mr. Johnsamson visited DC Prentice for chiropractic treatment.[78]

On March 25, 2016, Mr. Johnsamson had an MRI of the cervical spine. The MRI showed "[m]ild multilevel cervical spondylosis" and "[a] large right posterior paracentral

---

[75] A.R. 22–24, 677–79.

[76] A.R. 287–90.

[77] A.R. 785–88.

[78] A.R. 869–73.

disc osteophyte complex and uncovertebral osteophytes at C6-7" causing "severe right neural foraminal origin stenosis and mild central spinal canal stenosis."[79]

On March 30, 2016, Mr. Johnsamson visited DC Prentice for chiropractic treatment.[80]

On March 31, 2016, Mr. Johnsamson saw PA Glenn. He reported "ongoing cervical spine pain mainly on the left with feelings of continued weakness into his hands." PA Glenn diagnosed Mr. Johnsamson with ongoing chronic cervical spine pain with right C6-C7 disc protrusion; weakness in bilateral upper hands and hand intrinsics; significant anterior osteophytes C4-C7; and lower back pain, not fully evaluated. PA Glenn reviewed the MRI and noted that Mr. Johnsamson had "degenerative changes with degenerative spondylosis throughout his cervical spine with a larger disc protrusion at the right at C6-C7" and that the protrusion did "impress upon what appears to be the exiting C7 nerve root," but that Mr. Johnsamson had "[n]o other significant abnormalities" and the "cord diameter [was] maintained at about 10 mm." PA Glenn noted that he did "not think [Mr. Johnsamson was] fully disabled" and that Mr. Johnsamson was "able to perform some type of employment." He noted that Mr. Johnsamson indicated he did "not want to do an epidural" and did not "seem like he [wanted] to get much better with treatments that I offered."[81] PA Glenn also completed a health care provider form for FMLA. He opined

_____

[79] A.R. 20–21, 682–83.

[80] A.R. 874–77.

[81] A.R. 25–26, 680–81. On the same date, Mr. Johnsamson visited Shelly Waltrip, LMT, at Chugach Chiropractic for manual muscle therapy. A.R. 878–79.

that Mr. Johnsamson was unable to work at the time, but if his symptoms improved he "may be able to return to work in the future." PA Glenn recommended an epidural steroid injection.[82]

On April 8, 2016, Mr. Johnsamson visited DC Prentice for chiropractic care.[83]

On July 6, 2016, Mr. Johnsamson saw Cynthia Davis, RN, at the Elmendorf Disease Management clinic, for follow up on diabetes mellitus, type 2, without complications.[84]

On August 16, 2016, Mr. Johnsamson followed up with NP Hess. He reported that he continued to have back and neck pain and he needed a referral for more chiropractor visits.[85]

On September 12, 2016, Mr. Johnsamson followed up at Chugach Chiropractic Clinic for chiropractic treatment.[86]

On December 21, 2016, Mr. Johnsamson initiated care with Zachary Johnson, PA-C, at Anchorage Fracture and Orthopedic Clinic. He reported right shoulder pain and bilateral knee pain. On physical examination of the shoulder, PA Johnson observed no ecchymosis and no edema, "good strength with resisted abduction and an external

---

[82] A.R. 283–86.

[83] A.R. 880–84. Mr. Johnsamson also attended chiropractic treatment sessions on April 14, 2016, May 17, 2016, May 24, 2016, May 31, 2016, June 7, 2016, June 16, 2016, June 21, 2016, June 28, 2016, July 12, 2016, July 22, 2016, and August 3, 2016. A.R. 885–941.

[84] A.R. 776.

[85] A.R. 789–91.

[86] A.R. 942–50.

rotation," but "slight weakness with internal rotation"; and a positive Neer and Hawkins impingement sign. On physical examination of the knees, PA Johnson observed no ecchymosis; no edema; tenderness at the medial and lateral joint line and medial and lateral aspects of the patella; a stable varus and valgus stress test, and a negative Lachman's and anterior and posterior drawer. PA Johnson assessed Mr. Johnsamson with "[c]hronic right shoulder pain concerning for rotator cuff tendinopathy"; "[o]steoarthritis of the knees bilaterally"; and "[c]hronic bilateral knee pain with concerns for possible meniscus injury of the left knee." X-rays of the right shoulder showed "[m]ild osteoarthritis of the right acromioclavicular joint and possible injury to the rotator cuff." X-rays of the knees showed "[o]steoarthritis of the knees bilaterally."[87]

On December 27, 2016, Mr. Johnsamson had an MRI of his right shoulder. The MRI showed moderate acromioclavicular osteoarthritis and mild subacromial subdeltoid bursitis; "[s]evere anterior infraspinatus tendinopathy and partial-thickness intrasubstance degenerative tear of the anterior infraspinatus tendon insertion"; and "[m]ild partial-thickness glenohumeral chondrosis." Mr. Johnsamson also had an MRI of his left knee. The left knee MRI showed mild lateral patellofemoral chondrosis.[88]

On December 29, 2016, Mr. Johnsamson had an MRI of the lumbar spine. The MRI showed "[d]iffuse congenital narrowing of the lumbar spinal canal along with prominent intraspinal fat that causes diffuse mild stenosis of the subarachnoid space";

---

[87] A.R. 965–67.

[88] A.R. 17–18, 977–78.

"L2-L3 disc protrusion that combined with above causes moderate to severe stenosis of the subarachnoid space"; L3-L4 and L4-L5 degenerative joint disease with mild left L3-L4 and bilateral L4-L5 mild neural foramen stenoses; and L5-S1 disc extrusion with severe left lateral recess and neural foramen stenoses.[89]

On January 3, 2017, Mr. Johnsamson saw Ernest Meinhardt, M.D., for an evaluation of his right shoulder and bilateral knee pain. On physical examination, Dr. Meinhardt observed decreased range of motion of the shoulder and pain with abduction and rotation; bilateral knee pain to palpation; and a slow, shuffling gait with a limp favoring his left leg.[90]

On January 12, 2017, Shirley Fraser, M.D., a state agency reviewing physician, opined that Mr. Johnsamson could perform his past relevant work as a transportation assistant. She opined that Mr. Johnsamson was limited to lifting and carrying 25 pounds occasionally and 20 pounds frequently; standing a total of four hours and sitting a total of six hours in an eight-hour workday; and pushing and pulling with the right arm occasionally. Dr. Fraser also opined that Mr. Johnsamson was limited to climbing ramps and stairs occasionally; climbing ladders, ropes, and scaffolds occasionally; and stooping,

---

[89] A.R. 19, 975–76. On December 30, 2016, PA Johnson recommended a cortisone injection for "mild lateral patellofemoral chondrosis" of the left knee and a cortisone injection for his right shoulder. A.R. 979.

[90] A.R. 983–86.

kneeling, crouching, and crawling occasionally. Dr. Fraser opined that Mr. Johnsamson should avoid excess cold and heat and avoid hazards.[91]

On January 26, 2017, the Office of Personnel Management wrote a letter notifying Mr. Johnsamson that he was found to be disabled "for your position as [a] Traffic Management Specialist for Intervertebral Disc Disorder-Lumbar, Chronic Neck Pain only." His application for disability retirement under the Federal Employees Retirement System ("FERS") was approved.[92]

On March 25, 2017, Mr. Johnsamson followed up at Chugach Chiropractic Clinic.[93]

On April 19, 2017, Mr. Johnsamson saw PA Johnson at Anchorage Fracture and Orthopedic Clinic for a cortisone injection in the right shoulder and the left knee.[94]

On May 2, 2017, Mr. Johnsamson initiated care with Jaclyn Levesque, PT, DPT, at Healthwise Physical Therapy in Eagle River, Alaska for physical therapy to relieve low back pain. He reported difficulty sleeping, that he was unable to work, and was unable to sit, stand, or walk more than 20 minutes.[95]

---

[91] A.R. 113–15.

[92] A.R. 31. As discussed *infra,* this document was not in the record before the ALJ, but was later submitted to the Appeals Council.

[93] A.R. 1015–16. Mr. Johnsamson also followed up at Chugach Chiropractic Clinic on March 31, 2017, April 6, 2017, April 11, 2017, April 19, 2017, April 27, 2017, May 5, 2017, May 10, 2017, May 15, 2017, May 20, 2017, May 26, 2017, June 2, 2017, and June 9, 2017. A.R. 1017–72, 1087–88.

[94] A.R. 1194–97.

[95] A.R. 987–92. Mr. Johnsamson also attended physical therapy sessions at Healthwise Physical Therapy on May 4, 2017, May 8, 2017, May 17, 2017, May 19, 2017, May 26, 2017, May 30, 2017, June 1, 2017, June 8, 2017, June 20, 2017, June 27, 2017, and July 11, 2017.

In an undated letter, DC Prentice opined that "based on objective medical findings and in my professional opinion," Mr. Johnsamson was "functionally limited and impaired from work-related physical activities such as prolonged sitting or standing, lifting or carrying of other [sic] than light objects placed conveniently for him to pick up without bending or twisting, sustained walking, or travel of long distances without the flexibility to take frequent breaks or change position."[96]

*Hearing Testimony on August 1, 2017*

Mr. Johnsamson attended a hearing before ALJ Hebda on August 1, 2017 without an attorney or other representative. He testified that he last worked in November 2015 as a traffic management specialist and that it was an office job, but it involved lifting boxes and computers. He testified that in the past he also worked in patient services assistance, as a passenger baggage processor, and air transportation specialist. At the hearing, Mr. Johnsamson testified that, "my neck and my back are the two main problems, that's the reason I can't work." He also indicated that he had problems with his knees, right shoulder, and back. Mr. Johnsamson reported that he had headaches, plantar fasciitis, insomnia, carpal tunnel, hearing loss, dry eyes, and sleep apnea. He indicated that his back pain was in his lower back, mid-back, and neck and averaged a seven or eight on a scale of one to ten. He testified that his neck pain was the worst pain and that it was sharp and shot up his right side. Mr. Johnsamson testified that Motrin worked "up to a

---

A.R. 993–1013, 1145–56, 1192–93.

[96] A.R. 30.

point" and that he also took Flexeril for his pain. He testified that he could not bend down and lift up with his legs, go up and down stairs, or walk more than 40 minutes. Mr. Johnsamson testified that he had difficulty dressing himself, but he could shower and bathe on his own. He indicated that he did not perform any household chores and did not do yard work. He testified that he spent his day reading the news, sitting or lying on the couch, working on the computer, and going to doctor's appointments. He reported that he would occasionally go for a walk with his family for 20-30 minutes and see his grandbaby "once in a while." He also testified that he lived in a three-story house and he could drive.[97]

Robert Sklaroff, M.D., testified as the medical expert. Based on his review of the record, Dr. Sklaroff indicated that Mr. Johnsamson's primary physical problems were related to his neck, degenerative joint disease, degenerative disc disease, and headaches. Dr. Sklaroff noted that there was "no evidence of radiculopathy." Dr. Sklaroff opined that Mr. Johnsamson had "a metabolic syndrome associated with exogenous obesity, and that is associated with the diabetes, the hypertension and the sleep apnea." He also noted, "all of those other metabolic problems as you confirmed are really not major issues in terms of what would be an impairment that would cause an inability to work." Dr. Sklaroff indicated that Mr. Johnsamson's pain was managed by pain medications. Specifically, he testified, "there is no mention also of the Gabpentin, nor is there any mention of the failure to use any narcotic medication to alleviate the pain

---

[97] A.R. 59–62, 65–69, 83–96.

because of the problems regarding dizziness." He opined that although there was a diagnosis of weakness in the bilateral upper hands and hand intrinsics in Mr. Johnsamson's medical record, "whatever problem the person would have in terms of lifting, there can be compensation for the left arm even if the right arm can't lift as much." He testified that Mr. Johnsamson was not "at maximum medical improvement" and "potentially would benefit from a bariatric consultation." Dr. Sklaroff opined that Mr. Johnsamson could stand, sit, or walk up to six hours each in an eight-hour workday. He also opined that Mr. Johnsamson could lift 50 pounds occasionally, 25 pounds frequently with no limitations pushing, pulling, squatting, bending, or reaching.[98] Although Mr. Johnsamson reported having a VA disability rating, Dr. Sklaroff testified that he did "not depend upon the VA disability evaluations, but [he] didn't see one."[99] Also at the hearing, Mr. Johnsamson testified that he provided neurology records from Manhattan, New York, but the ALJ asked Dr. Sklaroff "to just proceed based on what we have in the file."[100]

---

[98] A.R. 62–83.

[99] At the August 1, 2015 hearing:

> Mr. Johnsamson stated, "Sir, were you able to look at the VA disability rating when they examined me?"
> Dr. Sklaroff replied, "I do not depend upon the VA disability evaluations, but I didn't see one.
> Mr. Johnsamson then stated, "It's on 1-D, and it shows all my back problems."
> Dr. Sklaroff stated, "1-D I do not have. I only have 1-F." A.R. 79–80.

[100] A.R. 67–69. After Mr. Johnsamson testified that he provided documentation from a neurologist in Manhattan, the ALJ stated:

> We have very strict rules and regulations regarding the submission of medical evidence . . . [n]ow you're talking about something that we don't have in the record, and we're sitting here in the hearing right now . . . and you're talking about something that is a number of years before the period of time that we're

John Head testified as the vocational expert ("VE"). Based on the ALJ's first hypothetical, he opined that Mr. Johnsamson could perform all of his past work "with the exception of the baggage handler."[101] Based on the ALJ's further limitation of frequent kneeling, VE Head opined that the positions of schedule clerk and medical record clerk "would be satisfactory." Based on the ALJ's limitation of light work instead of medium work, VE Head opined that the individual could still work as a scheduling clerk and medical records clerk.[102]

*Mr. Johnsamson's Function Report*

Mr. Johnsamson completed a function report on September 8, 2016. He reported that he could not stand or sit due to chronic back, neck, and knee pain. He also noted that he had "frequent migraines that start from my neck and go to my head" and that they "are continually getting worse and more frequent which prevents me from concentrating on my work" and "led to routine mistakes at work." Mr. Johnsamson reported that he had pain and insomnia and his sleep medications made him "groggy" and unable to "concentrate the next morning." He reported that his back pain "also cause[d] anal leakage that must be managed throughout the day with frequent bathroom visits." He

---

dealing with . . . [a]nd I'm going to ask the doctor to just proceed based on what we have in the file. A.R. 68–69.

[101] The ALJ's first hypothetical was as follows:

I have an individual with the claimant's age, education, past work experience, who would be able to perform medium level work as defined by the Social Security Administration, with the following limitations. We would have frequent climbing of ladders, ropes and scaffolding. A.R. 98.

[102] A.R. 96–100.

reported that he did not prepare his own meals because he was "unable to stand or bend" and experienced a "loss of sensation in [his] hands to heat and cold." He noted that he could do light chores that did not involve standing or bending, but did not do yard work. Mr. Johnsamson indicated that he went outside 3-4 times a week; could drive and ride in a car; shop in stores, by mail, and by computer; and pay bills and count change. He indicated that he watched television and videos; read; and went to doctor's appointments. He also indicated that he attended church services but his attendance was "very limited." Mr. Johnsamson reported that his chronic pain and medication side-effects, including mood changes, affected lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, hearing, stair-climbing, seeing, memory, completing tasks, concentration, understanding, following instructions, using his hands, and getting along with others. He also noted that medication side effects and hearing difficulties affected his comprehension of written and spoken instructions.[103]

## IV.    DISCUSSION

Mr. Johnsamson is now represented by counsel. In his opening brief, Mr. Johnsamson asserts that the "agency decision failed to take account of the additional evidence that Mr. Johnsamson submitted to the Appeals Council." He also alleges that the ALJ: (1) failed to fully and fairly develop the record "by carrying out the specific recommendation for further diagnostic testing that was made at [the] hearing by medical expert Dr. Sklaroff" and (2) failed to "account for and to weigh the functional medical

---

[103] A.R. 357–65.

evaluation and medical source statement of treating physician Heather Jones, M.D.."[104] The Commissioner disputes Mr. Johnsamson's assertions.[105]  The Court addresses each of Mr. Johnsamson's assertions in turn:

A. <u>Additional Evidence</u>

In its decision, the Appeals Council stated that Mr. Johnsamson had submitted additional documents to the Council from:  (1) James Glenn, PA-C, dated March 15, 2016 to March 31, 2016; (2) medical records from Imaging Associates dated March 25, 2016 to December 29, 2016; (3) Brooklyn HSS Veterans Hospital dated August 24, 2015 to September 2, 2015; and (4) Office of Personnel Management statement dated January 26, 2017.  The Appeals Council determined that this evidence did not "show a reasonable probability that they would change the outcome of the decision" and it did not "consider and exhibit this evidence."[106]

Mr. Johnsamson asks the Court "to fulfill its role by reversing the final agency decision and remanding the claim to the agency for fact finding in the first instance to take account of the entire record, including additional evidence."  Specifically, he asserts that the Brooklyn HSS Veterans Hospital records "corroborate Mr. Johnsamson's hearing testimony" and update an earlier medical record regarding "substantial lower back pain that impacted his ability to sit and to stand."  Mr. Johnsamson also argues that the

---

[104] Docket 14 at 3.

[105] Docket 15 at 6–14.

[106] A.R. 5.

additional VA records from James Glenn, PA-C, show that Mr. Johnsamson "may not be able to perform his work, and that opinion was rendered in the context of a decision that found Mr. Johnsamson not disabled based on [his] purported ability to return to past relevant work."  He also asserts that the medical records from Imaging Associates "continue[d] the examination of and medical planning of spinal difficulties, the degenerative joint disease and degenerative disc disease."[107]

1. *Legal Standard*

When the Appeals Council declines review, its decision is not subject to judicial review and "the ALJ's decision becomes the final decision of the Commissioner."[108] However, the district court considers the additional evidence, "which was rejected by the Appeals Council, to determine whether, in light of the record as a whole, the ALJ's decision was supported by substantial evidence and was free of legal error."[109]  The SSA permits a claimant to provide evidence from non-physician sources  as to the severity of an impairment and how it affects a claimant's ability to work, including  evidence  from  a nurse  practitioner,  physician  assistant  (PA),  chiropractor,  or  therapist,   including  a

---

[107] Docket 14 at 13–14.

[108] *Taylor v. Comm'r of Soc. Sec. Admin.,* 659 F.3d 1228, 1231 (9th Cir. 2011); *see Klemm v. Astrue,* 543 F.3d 1139, 1144 (9th Cir. 2008) ("The Social Security Act grants to district courts jurisdiction to review only 'final decisions' of the Commissioner") (citing 42 U.S.C. § 405(g)).

[109] *Id.* at 1232.  *See also Brewes v. Comm'r of Soc. Sec. Admin.,* 682 F.3d 1157, 1163 (9th Cir. 2012) ("[W]e hold that when the Appeals Council considers new evidence in deciding whether to review a decision of the ALJ, that evidence becomes part of the administrative record, which the district court must consider when reviewing the Commissioner's final decision for substantial evidence.").

physical therapist.[110]   The ALJ may discount opinions from these "other sources" if the ALJ "gives reasons germane to each witness for doing so."[111]

2. *PA Glenn's Records dated March 15, 2016 through March 31, 2016*

Mr. Johnsamson initiated care with PA Glenn on March 15, 2016.  The medical records submitted to the Appeals Council from PA Glenn included treatment notes from March 15, 2016 through March 31, 2016.[112]   These same treatment notes were in the record before the ALJ.[113]   However, the ALJ's decision does not reference or discuss these records.

On March 31, 2016, PA Glenn opined that Mr. Johnsamson was not disabled at that time and that "he [was] able to perform some type of employment."  PA Glenn also noted that Mr. Johnsamson "may not be able to go back to what he was doing before and he states that he cannot concentrate due to the pain, but I did advise him that the whole purpose of us seeing him is to treat his pain, get it under better control so that he can go back to work and do his normal job or at least be employed in some type of capacity."[114]   PA Glenn completed a health care provider form on the same date and opined that Mr. Johnsamson was unable to work at the time, but if his symptoms

---

[110] 20 C.F.R. §§ 404.1513(d), 416.913(d).  These sections apply to claims filed before March 27, 2017.

[111] *Turner v. Comm'r of Soc. Sec.,* 613 F.3d 1217, 1224 (9th Cir. 2010) (quoting *Lewis v. Apfel,* 236 F.3d 503, 511 (9th Cir. 2001)).

[112] A.R. 22–26.

[113] A.R. 677–81.

[114] A.R. 25–26, 680–81.

improved he "may be able to return to work in the future."[115]  Based on his diagnoses at

the March 2016 visits, PA Glenn recommended an epidural steroid injection.[116]  PA

Glenn's work opinion was based on treatment records from a limited time period of

approximately one month, but it was supported by the work opinion of Dr. Jones and the

VA rating of 100% disability.[117]  Therefore, the ALJ was required to provide germane

reasons for discounting PA Glenn's opinion.[118]  But in this case, the ALJ did not address

PA Glenn's opinions in his decision.[119]  In light of the record as a whole, the ALJ's

decision not to address PA Glenn's work opinion at all was legal error.

### 3. *Imaging Associates' Records dated March 25, 2016 to December 29, 2016*

Imaging Associates' MRI records were submitted to the Appeals Council and were

also part of the record before the ALJ.[120]  Further, the ALJ briefly discussed this MRI

---

[115] A.R. 283–86.

[116] A.R. 25, 680.  An epidural injection may be considered more than conservative treatment.
"Conservative treatment" has been characterized by the Ninth Circuit as, for example,
"treat[ment] with an over-the-counter pain medication" (*see, e.g., Parra v. Astrue,* 481 F.3d 742,
751 (9th Cir. 2007); *Tommasetti v. Astrue,* 533 F.3d 1035, 1040 (9th Cir. 2008) (holding that ALJ
properly considered the plaintiff's use of "conservative treatment including physical therapy and
the use of anti-inflammatory medication, a transcutaneous electrical nerve stimulation unit, and
a lumbosacral corset")), or a physician's failure "to prescribe . . . any serious medical treatment
for [a claimant's] supposedly excruciating pain," *Meanel v. Apfel,* 172 F.3d 1111, 1114 (9th
Cir.1999).

[117] A.R. 22–26, 44, 677–81, 671–72.

[118] *Turner,* 613 F.3d at 1224.  *See also infra* notes 135, 140.

[119] The ALJ's discussion of the opinion evidence involved discounting non-examining medical
expert Shirley Fraser's opinions and providing great weight to non-examining medical expert Dr.
Sklaroff's testimony and opinions.  A.R. 45.

[120] A.R. 17–21, 682–83, 951–54, 975–76, 1157–60.

evidence in his opinion.[121] Therefore, in light of the record as a whole, the ALJ's discussion of the MRI evidence from Imaging Associates from March 25, 2016 to December 29, 2016 was supported by substantial evidence and free from legal error.

  4. *Brooklyn HHS Veterans Hospital Records dated August 24, 2015 to September 2, 2015*

The medical records from Brooklyn HHS Veterans Hospital from August 24 to September 2, 2015 were submitted to the Appeals Council. However, it appears they were also in the record before the ALJ at the time of his decision.[122] As of July 15, 2015, PA Otero opined that a "decompression would most likely address [Mr. Johnsamson's] left lower extremity radicular symptoms; but not address his chronic complaints of back pain." PA Otero also opined that Mr. Johnsamson was "neurologically stable except for his subjective complaints of left lower extremity numbness" and she recommended a trial of conservative therapy including physical therapy, back school, HEP, acupuncture, and other modalities as needed; an interventional pain management consultation for ESI evaluation; and pool therapy. PA Otero's update on August 24, 2015 noted that Mr. Johnsamson had called to request paperwork and the addendum on September 2, 2015 noted that PA Otero had filled out FERS disability forms pursuant to Mr. Johnsamson's request.[123]

---

[121] The ALJ noted that in December 2016, "while MRI images showed osteoarthritic and degenerative changes, the course of recommended treatment was simply steroid injections." A.R. 44.

[122] A.R. 5, 12–16, 666–70; *but see* Docket 16 at 2-4.

[123] A.R. 12–16, 666–70.

At the hearing, it appeared that neither the ALJ nor Dr. Sklaroff had reviewed the VA records from the Brooklyn HHS Veterans Hospital. Yet the ALJ "ask[ed] the doctor to just proceed based on what we have in the file."[124] The ALJ then gave "great weight" to Dr. Sklaroff's testimony and opinions.[125] Although the records from Brooklyn HHS Veterans Hospital were evidently part of the record before the ALJ, the testifying medical expert indicated he had not reviewed them. Hence it is unknown whether the opinions of PA Otero would have had any impact on Dr. Sklaroff's testimony. Likewise, the ALJ's decision does not reference the VA records from Brooklyn and PA Otero's assessment. The failure to address these records constituted legal error.

5. *The FERS Disability Determination*

On January 26, 2017, the Office of Personnel Management wrote to Mr. Johnsamson to inform him that he had been found "disabled for your position as an Traffic Management Specialist," and his application for FERS disability retirement had been approved.[126] This document was not before the ALJ; the Appeals Council received but did not consider this document, as it concluded it "does not show a reasonable probability that [it] would change the outcome of the decision."[127]

Mr. Johnsamson's opening brief failed to explain how the OPM letter was likely to

---

[124] A.R. 67–69. *See supra* note 99, 100.

[125] A.R. 45.

[126] A.R. 31–32.

[127] A.R. 5.

change the outcome of the agency's decision.[128]  As this matter is being remanded on

other bases, on remand the ALJ must consider the FERS disability rating.[129]  In particular,

based on this Court's review of the testimony at the administrative hearing, it appears that

one of the jobs that the vocational examiner testified could still be performed by Mr.

Johnsamson, the schedule clerk, is the same job that FERS determined in January 2017

that Mr. Johnsamson could no longer perform, the traffic management specialist position

he had held.[130]

Thus, considering the record as a whole, including the records from the Brooklyn

HHS Veterans Hospital, PA Glenn's undiscussed work opinion, and the FERS disability

determination, the ALJ's decision was not supported by substantial evidence and not free

from legal error.

B.  Development of the Record

Mr. Johnsamson asserts that the ALJ failed to fully and fairly develop the record by

failing to "follow through on Dr. Sklaroff's recommendation" that Mr. Johnsamson

"potentially would benefit from a bariatric consultation."[131]  The ALJ has an "independent

duty to fully and fairly develop the record and to assure that the claimant's interests are

---

[128] *See Smith v. Univ. of Wash.*, 194 F.3d 1045, 1052 (9th Cir. 1999) (holding arguments not properly raised in opening brief deemed waived).

[129] *Cf. McLeod v. Astrue*, 640 F.3d 881, 885 (9th Cir. 2011) (holding that VA disability rating "must be considered and ordinarily must be given great weight").

[130] *See* A.R. 83, 86 ("Traffic management specialist.  That was a desk job mainly billing and scheduling and stuff.").

[131] Docket 14 at 3, 16; A.R. 78.

considered."[132]  An "ALJ's duty to develop the record farther is triggered only when there is ambiguous evidence or when the record is inadequate to allow for proper evaluation of the evidence."  Additionally, the "ALJ must be especially diligent when the claimant is unrepresented or has only a lay representative."[133]  If the evidence is insufficient to make a decision regarding disability or the ALJ cannot reach a conclusion based on the evidence it has before him, he may recontact a treating physician, psychologist, or other medical source; request additional existing records; or ask for more information from the claimant or others.[134]  An ALJ has broad discretion in determining whether to order a consultative examination and may do so when "ambiguity or insufficiency in the evidence . . . must be resolved."[135]

Here, Mr. Johnsamson testified that his inability to work was due to functional limitations caused by pain in his neck, back, shoulder, and knee, as well as related headaches and insomnia.[136]  In his function reported, Mr. Johnsamson stated that he

---

[132] *Tonapetyan v. Halter,* 242 F.3d 1144, 1150 (9th Cir. 2001) (internal citations and quotations omitted).

[133] *McLeod v. Astrue,* 640 F.3d 881, 885 (9th Cir. 2011) (internal citations omitted).

[134] *Smolen v. Chater,* 80 F.3d 1273, 1288 (9th Cir. 1996) ("If the ALJ thought he needed to know the basis of [a doctor's] opinions in order to evaluate them, he had a duty to conduct an appropriate inquiry, for example, by subpoenaing the physicians or submitting further questions to them."); *see also* 20 C.F.R. §§ 404.1520b, 416.920b (effective until March 27, 2017).

[135] *Reed v. Massanari,* 270 F.3d 838, 842 (9th Cir. 2001) (citation omitted).  *See also* 20 C.F.R. § 404.1519a(b) (A consultative examination may be purchased "to try to resolve an inconsistency in the evidence, or when the evidence as a whole is insufficient to allow us to make a determination or decision on your claim.").

[136] A.R. 43, 63, 65–66, 90–96.

was "unable to sit or stand due to chronic back, neck, and knee pain." He also noted he had "frequent migraines that start from my neck" and was "unable to sleep at night."[137] The medical record does not show uncontrolled hypertension, hyperlipidemia, diabetes mellitus or problems with medications for those conditions.[138]

For the foregoing reasons, the ALJ was not required to order a bariatric consultation examination in this case and no legal error occurred in this regard.

C.     Medical Opinion

Mr. Johnsamson asserts that the ALJ "failed to account for and to weigh the functional medical evaluation and medical source statement of treating physician Heather Jones, M.D., which is inconsistent with the residual functional capacity that led to Step Four denial of this claim." Specifically, he alleged that the ALJ "vaguely acknowledged Heather Jones, M.D., but did not weigh her medical source statement and functional medical evaluation."[139]

1.  *Legal Standard*

"Regardless of its source, [the SSA] will evaluate every medical opinion [it] receive[s]."[140] Medical opinions come from three types of sources: those who treat the

---

[137] A.R. 43, 357

[138] *e.g.,* A.R. 227–31, 547–53, 569–72, 776.

[139] Docket 14 at 3, 19; *see* A.R. at 44 (stating in ALJ decision, "other examining physicians aware of the claimant's 100% VA disabled status have noted that the claimant should still be able to pursue a meaningful career and not be precluded from working due to his neck and back pain.").

[140] 20 C.F.R. § 404.1527(c). This section applies to claims filed before March 27, 2017.

claimant; those who examine but do not treat the claimant; and those who neither examine nor treat the claimant. "As a general rule, more weight should be given to the opinion of a treating source than to the opinion of doctors who do not treat the claimant."[141]  In the Ninth Circuit, "[t]o reject [the] uncontradicted opinion of a treating or examining doctor, an ALJ must state clear and convincing reasons that are supported by substantial evidence."[142]  When "a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons supported by substantial evidence."[143]  This can be done by "setting out a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings."  In disability benefits cases, physicians "may render medical, clinical opinions, or they may render opinions on the ultimate issue of disability — the claimant's ability to perform work."[144]  "Where an ALJ does not explicitly reject a medical opinion or set forth specific, legitimate reasons for crediting one medical opinion over another, he errs."[145]  Further, a VA disability rating "must be considered and ordinarily must be given great weight."[146]

---

[141] *Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014) (quoting *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)).

[142] *Trevizo v. Berryhill,* 871 F.3d 664, 675 (9th Cir. 2017) (alternations in original) (quoting *Bayliss v. Barnhart,* 427 F.3d 1211, 1216 (9th Cir. 2005)).

[143] *Revels v. Berryhill*, 874 F.3d 648, 654 (9th Cir. 2017) (quoting *Bayliss*, 42 F.3d at 1216).

[144] *Reddick v. Chater,* 157 F.3d 715, 725 (9th Cir. 1998) (internal citations omitted).

[145] *Garrison v. Colvin,* 759 F.3d at 1012.

[146] *McLeod v. Astrue,* 640 F.3d at 886.

2. *Analysis*

Dr. Jones, a family practitioner, examined Mr. Johnsamson and opined that she "believe[d] [Mr. Johnsamson was] able to work but may need to pursue a different type job." Additionally, she recommended he "pursue pain management for his neck as he [is] very young and should still be able to pursue a meanin[g]ful career and should be able to get his neck and back pain under control." She added that Mr. Johnsamson may "have to adjust [his] workstation, get lumbar support or have pain management [prescription] medications for pain."[147]

Dr. Jones's opinion that Mr. Johnsamson was capable of working at a different job and her opinion that Mr. Johnsamson could work with adjustments to his workstation, lumbar support, and pain management through medications were contradicted by the VA's 100% disabled rating.[148] It was also at odds with the testimony of Dr. Sklaroff, who identified only minimal limitations in Mr. Johnsamson's functionality.[149] Therefore, the ALJ was required to provide specific and legitimate reasons for discounting Dr. Jones's work opinion, including her opinion that although she believed Mr. Johnsamson could work, he may have to work at another job.[150]

---

[147] A.R. 671–72.

[148] The VA's most recent update to its 2012 rating decision was issued on August 10, 2015. A.R. 192–93, 227–31. *See also Hiler v. Astrue,* 687 F.3d 1208, 1212 (9th Cir. 2012) (holding ALJ must "ordinarily give great weight to a VA determination of disability.").

[149] A.R. 62-83.

[150] *See Hill v. Astrue,* 688 F.3d 1144, 1151 (9th Cir. 2012) (holding that ALJ erred in disregarding examining psychologist's assessment that claimant was unlikely to be able to sustain full time employment), *superseded by Hill v. Astrue*, 698 F.3d 1153, 1160 (9th Cir. 2012) (holding same).

Although the ALJ did not name Dr. Jones specifically in his decision nor assign her work opinion a specific weight, the ALJ used the portion of her opinion that Mr. Johnsamson "should still be able to pursue a meaningful career and not be precluded from working due to his neck and back pain" to discount the 100% disabled VA rating.[151] But the ALJ cannot simply choose to include the part of Dr. Jones's opinion that supports his decision and ignore the entirety of the opinion, even on the ultimate issue of disability.[152]

For the foregoing reasons, the Court finds that the ALJ did not provide specific or legitimate reasons for discounting Dr. Jones's work opinion. As a result, and considering the record as a whole, the ALJ's step four decision that Mr. Johnsamson could return to his previous work was not supported by substantial evidence.

### D.    Scope of Remand

The "ordinary remand rule" applies to disability cases. Under this rule, if "the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course, except in rare circumstances, is to remand to the

---

[151] A.R. 44, 671–72.

[152] *Ghanim v. Colvin,* 763 F.3d 1154, 1164 (9th Cir. 2014) ("[T]he ALJ improperly cherry-picked some of Dr. Dees's characterizations of Ghanim's rapport and demeanor instead of considering these factors in the context of Dr. Dees's diagnoses and observations of impairment."). *See also Holohan v. Massanari,* 246 F.3d 1195, 1202 (9th Cir. 2001) ("In disability benefits cases, physicians typically provide two types of opinions: medical opinions that speak to the nature and extent of a claimant's limitations, and opinions concerning the ultimate issue of disability."); *Garrison v. Colvin,* 759 F.3d at 1012–13 ("[A]n ALJ errs when he rejects a medical opinion or assigns it little weight while doing nothing more than ignoring it, asserting without explanation that another medical opinion is more persuasive, or criticizing it with boilerplate language that fails to offer a substantive basis for his conclusion.").

agency for additional investigation or explanation."[153]  Here, the Court has found that, in light of the record as a whole, the ALJ's decision was not supported by substantial evidence or free of legal error regarding the evidence submitted to the Appeals Council, most of which was already in the administrative record.  Specifically, the ALJ did not provide germane reasons for ignoring PA Glenn's work opinions.  Additionally, it is unclear if the testifying medical expert reviewed the Brooklyn HHS Veterans Hospital records, yet the ALJ afforded the expert's opinions great weight.  The Court has also found that the ALJ failed to provide specific or legitimate reasons for discounting Dr. Jones's work opinion and the ALJ's step four decision that Mr. Johnsamson could return to previous work was not supported by substantial evidence.

Mr. Johnsamson asks the Court to "reverse the final agency decision and remand the claim to the agency for *de novo* hearing and a new decision."[154]  Therefore, the case will be remanded for the ALJ to adequately analyze the opinions of PA Glenn and Dr. Jones, as well as other medical providers' functional and work opinions, in light of the record as a whole and the VA and FERS 100% disability ratings.  Additionally, the ALJ should take new testimony from a medical expert regarding the Brooklyn HHS Veterans Hospital records and other neurology reports in the record as necessary, adjust the RFC as warranted, and proceed to steps four or five as appropriate.

---

[153] *Treichler,* 775 F.3d at 1099 (quoting *Fla. Power & Light Co. v. Lorion,* 470 U.S. 729, 744 (1985)).

[154] Docket 14 at 22.

## V. ORDER

The Court, having carefully reviewed the administrative record, finds that the ALJ's determinations are not free from legal error. Accordingly, IT IS ORDERED that Mr. Johnsamson's request for relief at Docket 14 is GRANTED, the Commissioner's final decision is VACATED, and the case is REMANDED to the SSA for further proceedings consistent with this decision.

The Clerk of Court is directed to enter a final judgment accordingly.

DATED this 16th day of October 2019 at Anchorage, Alaska.

/s/ Sharon L. Gleason
UNITED STATES DISTRICT JUDGE